UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOANNE B. BROOKS, AS | ) | |
| ADMINISTRATRIX OF THE ESTATE | ) | |
| OF JASON MICHAEL HOURAN, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPECIALTY MINERALS INC., | ) | Docket No.  3:08-CV-30233-MAP |
| MINERALS TECHNOLOGIES INC., | ) | |
| BEMIS LINE CONSTRUCTION | ) | |
| COMPANY, INC, BEMIS | ) | |
| ENTERPRISES, INC., BEMIS, LLC and | ) | |
| HAWKEYE, LLC, | ) | |
|     Defendants | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
<u>BEMIS LINE CONSTRUCTION COMPANY, INC. AND BEMIS ENTERPRISES, INC.</u>**

<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

This is a time-barred tort claim arising from a construction project completed in 1998/99.

The plaintiff alleges injury on account of negligence in the design and construction of a power

substation that included an electric utility pole and its attached guy wire and guy insulator.

There is no dispute that contractor Bemis Line Construction Company, Inc. n/k/a Bemis

Enterprises, Inc. ("Bemis") substantially completed this work, including the substation's utility

pole, its guy wire, and guy insulator, in Adams, Massachusetts no later than 1999.  The

Massachusetts statute of repose at G.L. c. 260, § 2B extinguishes tort claims arising out of

alleged negligence in the design or construction of improvements to real property filed more than

six years after the substantial completion of that improvement.  Here, the plaintiff filed her

Complaint on December 16, 2008.  The dispositive question now before this Court is whether the

statute of repose operates to bar all the plaintiff's claims (and co-defendants' related cross-

claims) against Bemis.  Because the answer is yes, this Court must enter summary judgment in favor of Bemis.

FACTUAL AND PROCEDURAL BACKGROUND

A.    <u>Bemis's Work At Substation 15</u>.

Bemis is an electric utility contractor based in Jacksonville, Vermont.  Statement of Facts ("SOF") ¶ 1.  Before its business was sold in April 2006[1], much of Bemis's work involved setting high voltage utility lines and component parts (poles, wires, transformers, etc.) in rural areas.  (Bemis Affidavit, ¶ 6).  Though Bemis primarily worked for utility companies, occasionally it would work for other private customers.  (<u>Id.</u> ¶ 7).

One such customer was Specialty Minerals, Inc. ("SMI"), which owns and operates a large limestone mine in Adams, Massachusetts (hereinafter the "Adams Mine").  (SOF ¶ 2.  In 1998, SMI hired Bemis to install new electric power service to a pump house substation to pump water out of its quarry.  (<u>Id.</u> ¶ 4).  To complete this project, Bemis installed several utility poles and electrical equipment, and ran connecting wires, to this new substation at the Adams Mine known as Substation 15.  (<u>Id.</u> ¶ 5).

At Substation 15, Bemis installed three 167kva (a/k/a kilovolt ampere) transformers mounted at the top of a dead-end utility pole, together with wires connecting the transformers (hereinafter "tap connectors"), a guy wire, a guy insulator, and other component parts.  (<u>Id.</u> ¶ 6).

---

[1]      In a transaction that is of no relevance to the plaintiff's claims, Bemis Line Construction Company, Inc. was sold on April 14, 2006 to Bemis, LLC, an entity then controlled by New York-based The Hawkeye Group, LLC.  SOF ¶ 21.  Bemis Line Construction Company, Inc. thereafter changed its name to Bemis Enterprises, Inc. <u>Id.</u> ¶ 23.  After the name change, this entity never performed any work at SMI's Adams Mine.  <u>Id.</u> ¶ 24.  Though the plaintiff names them as two separate defendants, Bemis Line Construction Company, Inc. and Bemis Enterprises, Inc. are in fact one and the same corporate entity: Bemis Line Construction Company, Inc. n/k/a Bemis Enterprises, Inc.  This entity is herein referred to simply as "Bemis," not to be confused with the separately named defendant Bemis, LLC.  Because they are one corporate entity, the claims against Bemis Enterprises, Inc. and the claims against Bemis Line Construction Company, Inc. should be dismissed for the same reasons.

The guy wire[2] ran from the top of the pole to an anchor (hereinafter "guy anchor") in the ground. (Id.)  The single most important fact in this case is that Bemis undisputedly completed its design and installation of Substation 15 and all of its component parts (including its transformers, tap connectors, guy wire, and guy insulator) no later than 1999.[3]  (Id. ¶ 7).  To aid this Court, a post-accident photograph and diagram of Substation 15, together with its utility pole, guy wire, and component parts, are labeled and attached at **Tab I** to the contemporaneously filed Affidavit of Andrew R. Dennington.[4]

SMI owned and operated high-voltage lines within its Adams Mine, including Substation 15 and its component parts.  (Id. ¶ 9).  There never was a contract or agreement between Bemis and SMI (or any other party) that called for Bemis to regularly or periodically return to the Adams Mine to inspect, maintain, or repair Substation 15.  (Id. ¶ 10).  Instead, as its personnel readily agree, SMI would call upon Bemis on an as needed basis to perform certain well-defined, discrete projects, for which Bemis was paid.  (Id.)

With respect to Substation 15, this occurred on two occasions following its initial installation in 1998/99.  (Id. ¶¶ 12-13).  First, in 2003, SMI called upon Bemis to install electrical power service to a new 400-amp quarry pump at the existing pump house at Substation 15.  (Id. ¶ 12).  It is undisputed that this project did not involve any work whatsoever to the guy wire, guy insulator, guy anchor, or utility pole at Substation 15.  (Id.)

---

[2]      A "guy wire" is a tensioned cable designed to add stability to vertical structures such as utility poles.  Here, Bemis installed the guy wire uphill of the "dead-end pole" (i.e. the last in a series of poles) at Substation 15 in order to counterbalance the force exerted by the utility wires pulling that pole downhill.

[3]      Bemis's work on this project is documented by purchase orders and invoices from December 1998 and January 1999.  (Bemis Affidavit, **Tabs C** and **D**.)  As it turns out to be of no relevance whether this work was completed in 1998 or 1999 – because work completed in either year is beyond the limitations period – this memorandum refers to "1998/99" as the timeframe for this work.

[4]      The materials at this **Tab I** come from the post-accident investigative file of the Mine Safety and Health Administration (MSHA).  To aid the Court, some labeling has been added by Bemis's counsel.  MSHA issued

Second, in December, 2004, SMI experienced a power outage at Substation 15, believed at the time to be caused by a lightning strike.  (Id. ¶ 13).  SMI called upon Bemis to investigate the cause of this power outage, and to restore power.  (Id.)  It is undisputed that this project likewise did not involve any work whatsoever to the guy wire, guy insulator, guy anchor, or utility pole at Substation 15.  (Id. ¶ 13).  Bemis sent Randall Bemis and Dale Marchegiani to the Adams Mine on December 21, 2004.  (Id. ¶ 14).  They determined that the transformers at Substation 15 had been damaged and, in order to restore power, needed to be swapped out.   (Id.)

On January 28, 2005, Mr. Marchegiani returned to the Adams Mine to complete this work.  (Id. ¶ 15).  SMI had purchased new/substitute transformers, which were of the same height, configuration, and voltage (167kva) as the original transformers.  (Id.)  Mr. Marchegiani removed the old damaged transformers, and installed the substitute transformers on the existing brackets already attached to the dead-end pole at Substation 15, in the exact same position as the originally installed transformers.  (Id.)

Mr. Marchegiani wired the new transformers to each other using the existing tap connectors that Bemis originally had installed.  (Id. ¶ 17).  These tap connectors otherwise were not changed, as Mr. Marchegiani reattached them in the same position relative to the other component parts of Substation 15 (e.g., as they were at the time of Bemis's original installation).  (Id.)

In sum, after its original installation in 1998/99, Bemis never did any work to the guy wire, guy insulator, or guy anchor at Substation 15, nor was it ever called upon to do so.  (Id. ¶¶ 11, 20).  Nor did Bemis perform any work that altered the original configuration of Substation 15 and its component parts.  (Id. ¶ 17).

citations to Bemis and SMI for the accident.  Those citations were vigorously contested and ultimately resolved.  In any event, they are inadmissible in this proceeding.

B.    <u>The Accident And The Claims In This Lawsuit</u>.

On July 27, 2006, Jason M. Houran, a contract worker, was using a gasoline-powered weed trimmer, equipped with a circular steel blade, to cut weeds and brush near Substation 15. (<u>Id.</u> ¶ 19).  Near ground level, the trimmer's blade severed the guy wire from the dead-end pole, causing the guy wire to recoil and somehow contact the energized tap connectors on Substation 15 at a point below the end of the guy insulator.  (<u>Id.</u>)  See **Tab I** to Dennington Affidavit and Rodney Bemis Affidavit.  Mr. Houran was fatally electrocuted.  (SOF ¶ 12).[5]

Joanne B. Brooks, as Administrator of Mr. Houran's Estate, commenced this action on December 16, 2008.  (<u>Id.</u> ¶ 25).  The gist of her claim is that if Bemis had installed a longer guy insulator, the accident would have been avoided because the exposed portion of the guy wire severed by Mr. Houran (i.e. the portions below the end of the guy insulator) would not have contacted energized wires.  (Plaintiff's Answers to Bemis's First Set of Interrogatories, Nos. 14-20; Dennington Affidavit, **Tab G**).  Bemis refutes this claim and is backed by substantial evidence that: (a) the installation of the guy insulator rod met all codes and industry standards; and (b) the guy insulator rod's purpose is to protect men working on the pole, not to protect people on the ground against an accidentally severed guy wire.

Of course, Bemis also asserted the statute of repose as an affirmative defense in its original Answer (Paper No. 16) and in its Answer to the now operative First Amended Complaint ("FAC") (Paper No. 48).  The FAC (filed well into discovery) appears carefully pleaded in a (futile) attempt to avoid the six-year statute of repose.  G.L. c. 260, § 2B.  While alleging that Bemis was negligent in its original design, installation, and construction of

---

[5]    The mechanics of the accident are assumed for purposes of this motion, though not conceded by Bemis for any other purpose.

Substation 15 in 1998/99 (a clearly time-barred claim), FAC, ¶ 35, it also attempts to advance

more amorphous claims that purportedly accrued after the original installation:

> 33.    Prior to July 27, 2006, and at all relevant times hereto, there existed at Substation 15 unreasonably dangerous and hazardous conditions in violation of relevant industry standards, codes and regulations.

> 34.    These unreasonably dangerous and hazardous conditions and/or violations included Bemis Line Construction's: (a) failure to ensure that the guy wire to the Substation 15 utility pole was properly grounded and/or equipped with the proper amount of insulator protection; *(b) failure, in replacing the transformers at Substation 15 following the 2004 lightning strike, to ensure that its re-use or replacement of conductors would not create or pose a hazard in the event the guy wire at Substation 15 went slack; and/or (c) failure, in replacing the transformers at Substation 15 following 2004 lightning strike, to configure the conductors in such a manner so as to avoid the possibility of contact of the conductors with the exposed portions of the guy wire.*

> 35.    These unreasonably dangerous and hazardous conditions and/or violations included the improper installation of the guy wire, utility pole and transformers and attachments at Substation 15.

> 36.    These unreasonably dangerous and hazardous conditions and/or violations included the *improper repair of the guy wire, utility pole and transformers and attachments at Substation 15 after the 2004 lightning strike*.

> 37.    These unreasonably dangerous and hazardous conditions and/or violations were caused, in part, by *improper maintenance and monitoring* of the guy wire, utility pole, transformers and attachments thereto at Substation 15.

> 38.    These unreasonably dangerous and hazardous conditions and/or violations were caused, in part, by the *failure to properly inspect* the guy wire, utility pole, transformers and attachments thereto at Substation 15.

> ....

> 52.    Prior to July 27, 2006, Bemis Line Construction and/or Bemis Enterprises *failed to remedy* the unreasonably dangerous and hazardous conditions and/or violations at Substation 15.

> ...

> 57.    At all relevant times hereto, Bemis Line Construction and/or Bemis Enterprises *failed to warn* laborers and other individuals lawfully on the Adams mine premises, including Jason Michael Houran, of said unreasonably dangerous and hazardous conditions and/or violations.

FAC ¶¶ 33-38, 52, 57 (emphasis added).  The FAC asserts four counts against Bemis: Count IX

(Wrongful Death and Negligence), Count X (Wrongful Death and Malicious, Willful, Wanton,

Reckless and/or Grossly Negligent Conduct), Count XI (Conscious Pain and Suffering), Count

XII (Strict Liability).  FAC, ¶¶ 86-97.  Co-defendants SMI, Minerals Technologies, Inc. ("MTI")

(SMI's corporate parent), Bemis, LLC, and Hawkeye, LLC each have asserted Cross-Claims

against Bemis for contribution and common law indemnification.  All but one of these Cross-

Claims, a contractual indemnification claim asserted in Count II of the Cross-Claim of Bemis,

LLC and Hawkeye, LLC (Paper No. 52), entirely is derivative of plaintiff's claims against

Bemis.  Bemis now moves for summary judgment.

ARGUMENT

A.    <u>Summary Judgment Standard In Statute Of Repose Case</u>.

      "The role of summary judgment is to pierce the boilerplate of the pleadings and assay the

parties' proof in order to determine whether trial is actually required."  <u>Snow v. Harnischfeger</u>

<u>Corp.</u>, 12 F.3d 1154, 1157 (1st Cir. 1993) (affirming summary judgment based upon statute of

repose) (internal quotations and citations omitted).  "It is appropriate only if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  <u>Id.</u> (citing Fed. R. Civ. P. 56(c)).  While the initial

burden is on the moving party to establish the lack of a genuine, material factual issue: "Once a

defendant establishes that a complaint is putatively covered by the statute [of repose], the burden

shifts to the plaintiff to show facts to the contrary."  <u>Brown v. United States</u>, 514 F. Supp. 2d

146, 155 (D. Mass. 2007) (granting summary judgment based upon statute of repose) <u>aff'd on</u>

<u>separate grounds by</u> 557 F.3d 1 (1st Cir. 2009).  "Once the defendant has made a properly

7

supported motion for summary judgment... the plaintiffs may not rest upon mere allegation or

denials of their pleading, but must set forth specific facts showing there is a genuine issue for

trial." Snow, 12 F.3d at 1157.

B.      The Statute of Repose Bars All The Construction/Design Claims Against Bemis.

    1.      The Legislative Purpose And Function Of G.L c. 260, § 2B.

G.L. c. 260, § 2B provides:

> Action of tort for damages arising out of any deficiency or neglect in the design,
> planning, construction or general administration of an improvement to real
> property … shall be commenced only within three years next after the cause of
> action accrues; provided, however, that *in no event shall such actions be*
> *commenced more than six years after the earlier of the dates of: (1) the opening*
> *of the improvement to use; or (2) substantial completion of the improvement and*
> *the taking of possession for occupancy by the owner.*

par. 1 (emphasis added); see McDonough v. Marr Scaffolding Co., 412 Mass. 636, 643 (1992)

(holding that wrongful death action is "action of tort" subject to statute of repose). "General

Laws c. 260, § 2B, is not a statute of limitations but a statute of repose." Klein v. Catalano, 386

Mass. 701, 701 (1982). "A statute of repose ... limits the time within which an action may be

brought and is not related to the accrual of any cause of action." Id. "The injury need not have

occurred, much less have been discovered." Id. "Simply put, after six years, the statute

completely eliminates a cause of action against certain persons in the construction industry." Id.

    The Massachusetts Legislature enacted G.L. c. 260, § 2B in 1968 in response to case law

increasing the liability of architects, engineers, and contractors. Id. at 708 (reciting legislative

history of statute). "Since an ordinary statute of limitations did not begin to run until either the

date of the injury or its discovery, those involved in construction were subject to possible

liability throughout their professional lives and into retirement." Id. at 708-09. "At the urging of

those involved in the construction industry, the Legislature placed an absolute outer limit on the

duration of this liability." Id. at 709. "In establishing the six year limit, the Legislature struck what it considered to be a reasonable balance between the public's right to a remedy and the need to place an outer limit on the tort liability of those involved in construction." Id. at 710; see also Coca-Cola Bottling Co. of Cape Cod v. Weston & Sampson Engineers, Inc., 45 Mass. App. Ct. 120, 128 (1998) ("The Legislature has decided that, in matters involving the construction industry, six years is long enough."). As discussed more fully below, the plaintiff's entire case against Bemis will turn on a creative attempt to push that "outer limit" of liability well past the boundaries drawn by the Legislature. See id.

 2. *Bemis's Work Falls Within The Protective Ambit Of G.L. c. 260, § 2B.*

 "[T]he Legislature, by enacting § 2B, meant to protect providers of 'individual expertise' in the business of designing, planning, constructing, and administering improvements to real estate." Dighton v. Federal Pacific Elec. Co., 399 Mass. 687, 696 (1987) (internal quotations omitted). Bemis is a contractor providing expertise in electrical utility construction. (SOF ¶ 1). The Bemis workers who constructed Substation 15, among them Rodney Bemis and Dale Marchegiani, are licensed lineman who brought specialized training and experience to bear on this project. (Bemis Affidavit, ¶ 2; Marchegiani Affidavit, ¶ 2). In fact, SMI hired Bemis specifically because its own electricians lacked expertise in high-voltage installations. (SOF ¶ 4). Bemis therefore is the type of skilled construction professional covered by G.L. c. 260, § 2B. Compare Dighton, 399 Mass. at 696 (holding that supplier of circuit breaker panel who "does not claim to have rendered any such particularized services with respect to design or construction of the building" was not protected by § 2B).

 Further, the type of construction work that Bemis performed at Substation 15 is the type of work that falls within G.L. c. 260, § 2B's reference to "design, planning, construction or

general administration of an improvement to real property." "Whether a defendant's activities

fall within the statute [of repose] is a question of law." Snow, 12 F.3d at 1158. Courts

repeatedly have applied G.L. c. 260, § 2B to electric utility operations similar to those performed

by Bemis at Substation 15. See, e.g., Parent v. Stone & Webster Eng'g Corp., 408 Mass. 108,

111 (1990) (holding that installation of distribution panel at electrical plant was protected by

statute of repose); Montaup Elec. Co. v. Ohio Brass Corp., 561 F. Supp. 740, 747-50 (D.R.I.

1983) (applying Mass. law) (holding that construction of electric transmission lines was

protected by statute of repose). Electric utility products qualify as "improvements to real

property" because they are permanent additions to real property that make it more useful and

valuable. Montaup Elec. Co., 561 F. Supp. at 748. More specifically, courts have held that

erection of utility poles such as the one that Bemis installed qualify as "improvements to real

property." See, e.g., Brown, 514 F. Supp. 2d at 157-58; Afarian v. Mass. Elec. Co., 2003 WL

25335274 (Mass. Super. Ct.) (Haggarty, J.) aff'd on separate grounds by 449 Mass. 257 (2007)

(granting summary judgment dismissing wrongful death claim filed three decades after allegedly

negligent installation of utility pole). Bemis therefore is protected by G.L. c. 260, § 2B in its

defense of the plaintiff's claims.

3.    *All The Plaintiff's Claims Are In Tort And Are Time-Barred Because They Arise
      From An Improvement To Real Property Completed More Than Six Years Before
      This Action Was Filed.*

To the extent that the plaintiff – or any other party – alleges injury on account of Bemis's

installation of Substation 15 in 1998/99, those claims clearly are time-barred. G.L. c. 260, § 2B.

The plaintiff's only hope of avoiding the time bar is to argue that her claims somehow are not

based upon the one and only occasion (in 1998/99) that Bemis's worked on the guy wire and guy

insulator, but instead upon: (a) a continuing failure to remedy the defect allegedly created by

Bemis's original 1998/99 installation; (b) failure after 1998/99 to inspect Substation 15 in a manner that would have discovered the original defect; (c) failure to warn persons of the original defect; and/or (d) independent negligence (and causation) in the manner in which Bemis completed its repair work at Substation 15 on January 28, 2005.  FAC, ¶¶ 34-38, 52, 57 87, 95.[6]  As a matter of law, this attempted end-around the statute of response fails.   No matter the label assigned to them – "failure to remedy," "failure to warn," "failure to inspect," etc. – all the plaintiff's claims inescapably arise out of Bemis' allegedly insufficient insulation of the guy wire in 1998/99.  G.L. c. 260, § 2B.  Each of these theories is discussed in turn.

a.     <u>Failure To Correct/Remedy Defect Theory</u>.

The plaintiff cannot escape the statute of repose by suggesting that Bemis's liability arises from a continuing failure to correct or remedy the defect allegedly created by the 1998/99 installation.  FAC, ¶ 52.  The claim still arises out of, and is inescapably premised upon, work completed beyond the limitations period.  Massachusetts courts have rejected attempts to circumvent the statute of repose through a "failure to replace" theory.   <u>See, e.g.</u>, <u>Napolitano v. Mass. Turnpike Auth.</u>, 2007 WL 4993434 (Mass. Super.).

For example, in <u>Napolitano</u>, the plaintiff was injured in a 2002 motor vehicle collision allegedly caused by a defective "turned-down" guardrail that was installed in 1977.  2007 WL 4993434 at *1.  In 1990, the U.S. Department of Transportation published guidelines suggesting that this type of guardrail should be replaced, but the Turnpike Authority failed to do so.  <u>Id.</u>  The Superior Court refused to permit the plaintiff to characterize his claims as "negligent maintenance" rather than negligent design in order to escape the time bar.  <u>Id.</u> at *2.  "The fact

---

[6]     The plaintiff does not attempt any claim based upon Bemis's 2003 work at Substation 15, which involved running wires from the dead-end pole to power a new distribution panel inside the Substation 15 pump house.  (SOF ¶ 12).

that the [Turnpike Authority] did not replace the guardrails does not make this a case of negligent maintenance; under the statute of repose a party may be aware that a design is defective but the statute will not be tolled for failing to take action to replace the design." Id.

In Brown, the plaintiff was injured in 2004 when his motorcycle collided with a utility pole that Boston Edison installed no later than 1964. 514 F. Supp. 2d at 148-49, 155-56. In 1990, an unidentified entity installed a guardrail on the road-side of this utility pole. Id. at 150. In an attempt to escape the statute of repose, the plaintiff argued "that his claims are not based on an improper placement of the pole, but on the dangerous condition that was created when the guardrail was installed in 1990." Id. at 155. He alleged that "Boston Edison's negligence arises from its failure to remedy the dangerous and ongoing condition caused by the erection of the guardrail alongside, and on the 'wrong side,' of the pole." Id. at 155-56. The district court rejected this theory, and granted summary judgment to Boston Edison. Id. at 156, 157-58 aff'd on separate grounds by 557 F.3d 1 (1st Cir. 2009). Likewise here, the statute of repose bars the plaintiff from seeking to hold Bemis liable for failing to correct or remedy an alleged defect created by work completed more than six years before the Complaint was filed.

        b.     Failure to Inspect and Failure To Warn Theories.

The "failure to inspect" and "failure to warn" theories fare no better. The plaintiff may argue that, after the 2004 lightning strike brought it back to Substation 15, Bemis should have inspected Substation 15 – even though it never was asked to – so as to discover the defect allegedly created by the insufficiently insulated guy wire, and then correct it. But for statute of repose purposes, a claim that an inspection would have revealed the defect allegedly created by the 1998/99 installation is no different than alleging that the 1998/99 installation was defective in the first place. Despite the new label, plaintiff's "failure to inspect" claim still arises out of a

"deficiency or neglect in the design, planning, construction or general administration of an improvement to real property" substantially completed in 1998/99, and therefore is time-barred. G.L. c. 260, § 2B. The same is true as to any alleged failure to warn.

These theories also fail because Bemis never had a contract or agreement that called for inspection, maintenance, or repair of previously-completed work. (SOF ¶ 10). The absence of such a contract distinguishes this case from the result in <u>Parent</u>, where a contract gave rise to a duty to warn regarding past work. 408 Mass. at 114. In <u>Parent</u>, the plaintiff was electrocuted in 1987 by a distribution panel that the defendant-contractor installed in 1958. 408 Mass. at 109. In 1982, the contractor entered into a contract with the owner that called for an electrical safety evaluation. <u>Id.</u> at 109-10. While the statute of repose barred claims arising from the original 1958 installation, the SJC held that the plaintiff had a triable claim as to whether the contractor's post-installation contract called for it to inspect the allegedly defective distribution panel and install a warning sign beside it. <u>Id.</u> at 111. In contrast, Bemis never entered into any contract that would give rise to any such duty to inspect or warn. (SOF ¶ 10).[7]

     c.    <u>Alleged Negligence In 2005 Repair Work</u>.

The plaintiff's last hope is to allege injury on account of:

> Bemis Line Construction's: ... (b) failure, in replacing the transformers at Substation 15 following the 2004 lightning strike, to ensure that its re-use or replacement of conductors would not create or pose a hazard in the event the guy wire at Substation 15 went slack; and/or (c) failure, in replacing the transformers at Substation 15 following 2004 lightning strike, to configure the conductors in

---

[7]    At various points in this litigation, the plaintiff has suggested that a 1961 version of the National Electrical Safety Code ("NESC") obligated Bemis to inspect previously completed work. Provisions of the 1961 NESC concerning inspection do not apply here because they were not in force when Bemis performed its work at Substation 15. Nor do the 1997 or 2002 versions of the NESC, which provide in their respective Sections 011 ("Scope") that: "NESC rules do not cover installation in mines...." Tr. of Depo. of plaintiff's liability expert Duncan Glover, Ph.D., pp. 44:9-47:6, attached at **Tab J** to Dennington Affidavit. There is no applicable statute, regulation, or code provision mandating that Bemis – as opposed to SMI, the owner – inspect previously completed work. The "duty to inspect" that the plaintiff seeks to impose comes out of thin air. Moreover, as above, if such a duty existed at all, it was triggered in 1998/99 at the time of the original work. Thus, any claim predicated thereon is time barred.

> such a manner so as to avoid the possibility of contact of the conductors with the
> exposed portions of the guy wire.

FAC, ¶ 34.  To the extent that the plaintiff is alleging that Bemis's 2005 work somehow

*combined* with Bemis's 1998/99 work to create a hazard, that claim is time-barred.  So long as

Bemis's original installation – and the discretion that it exercised in sizing the guy insulator rod –

remains an essential element of plaintiff's claim, the claim still arises out of an alleged

"deficiency or neglect in the design, planning, construction or general administration of an

improvement to real property" that was substantially completed more than six years before the

Complaint was filed in 2008.  G.L. c. 260, § 2B.  Here, the relevant conditions of Bemis's 1998

work remained <u>unchanged</u> in 2005, and to the extent they caused this incident, any claim

predicated thereon is time barred.[8]

　　　　The mere fact that a contractor performs a subsequent repair does not set the statute of

repose as to past work running anew.  <u>See</u> <u>Sonin v. Mass. Turnpike Auth.</u>, 61 Mass. App. Ct.

287, 291 (2004).  In <u>Sonin</u>, the plaintiff struck a disabled vehicle along the highway.  61 Mass.

App. Ct. at 287-88.  The plaintiff and his wife alleged that the Turnpike Authority negligently

designed that stretch of highway by failing to provide a breakdown lane.  <u>Id.</u> at 288.  Though the

original design occurred long ago, the plaintiffs "contended that their claim for negligent design

was rejuvenated when, in 1992, the authority redesigned and improved the highway in the

vicinity of the accident without adding a breakdown lane."  <u>Id.</u>  The Appeals Court affirmed that

the statute of repose barred the claims.  <u>Id.</u> at 291; <u>see also</u> <u>Coca-Cola Bottling Co. of Cape</u>

<u>Cod</u>, 45 Mass. App. Ct. at 127 n.9 (in granting summary judgment for defendant, noting that the

plaintiff made no claim "that any postopening work by the defendant constituted an

---

[8]　　　To replace the transformers Bemis was paid under $3,000.  (Bemis Affidavit, ¶ 19).  In contrast, Bemis was
paid $28,531 in labor and materials for the original installation.  (<u>Id.</u> ¶ 11).

'independent' improvement to real property so that the six-year statute of repose would begin to run anew").[9]

In other professional liability settings, Massachusetts courts similarly reject attempts to circumvent statutes of repose by arguing that subsequent services revive otherwise time-barred claims.  For example, in <u>Rudenauer v. Zafiropoulos</u>, the defendant-doctor treated the plaintiff's husband in 1990 and 1991.  445 Mass. 353, 354 (2005).  After the husband died in 2000 from cancer that the defendant allegedly should have detected, the plaintiff filed suit in 2001.  <u>Id.</u>  The plaintiff argued that the husband's return to the doctor in 1995 gave rise to a "continuing treatment" exception to the seven-year statute of repose for medical malpractice actions at G.L c. 260, § 4.  <u>Id.</u> at 357.  The SJC rejected this argument because the Legislature's purpose in enacting the statute of repose was to place an absolute limit on liability that is not subject to any tolling.  <u>Id.</u> at 356-58.  While noting that the plaintiff theoretically could sustain a malpractice action based solely upon the doctor's treatment since 1994, the SJC entered summary judgment dismissing that claim because there was no evidence that any act or omission since 1994 was causally connected to the husband's death.  <u>Id.</u> at 360.

Likewise here, the plaintiff theoretically could make out a claim against Bemis based *solely* upon its 2005 repair work, if she could prove a causal connection between that repair work

_____

[9]    Courts in other jurisdictions have reached similar results.  <u>See, e.g.,</u> <u>Jordan v. Sandwell, Inc.,</u> 189 F. Supp. 2d 406, 416 (W.D. Va. 2002) ("this Court holds that when there is no nexus of causation between the subsequent work and the system that causes the accident-when, as here, the subsequent work involves repairs that do not implicate the defects that allegedly caused injury to the plaintiff-then the original work is complete for the purposes of § 8.01-250 [Virginia statute of repose]"); <u>Monson v. Paramount Homes, Inc.,</u> 515 S.E.2d 445, 449 (N.C. Ct. App. 1999) ("To allow the statute of repose to toll or start running anew each time a repair is made would subject a defendant to potential open-ended liability for an indefinite period of time, defeating the very purpose of statutes of repose...."); <u>Horosz v. Alps Estates, Inc.,</u> 642 A.2d 384, 389 (N.J. 1994) ("When a builder-developer performs repairs that constitute an improvement to real property after the initial construction has been completed, the owner has ten years from completion of the repair work to file an action against the builder-developer for defects relating *solely* to that repair work. With respect to defects unrelated to such repairs (defects resulting from the original construction), however, *N.J.S.A.* 2A:14-1.1 [statute of repose] runs from the date of the completion of the initial construction of the home.") (emphasis in original).

and the accident.  Such are not the facts of this case.  There is no evidence that Bemis's 2005

repair work – removing damaged transformers and installing identical replacements in the same

position – caused the guy wire to become energized below the point of the guy insulator after

Mr. Houran severed it on July 27, 2006.  See (SOF ¶¶ 15-17).  Nor is there any evidence that the

2005 repair work altered the configuration of Substation 15 or any of its component parts in a

way that caused Mr. Houran's accident.  (Id.).[10]  When pressed in discovery to articulate how

Bemis's 2005 repair work caused the accident, the plaintiff simply rehashed her allegation that

the repair should have prompted Bemis to realize its alleged past error and add new insulation to

the guy wire installed six years ago.  (Plaintiff's Answers to Defendant Bemis Line Construction

Company, Inc.'s First Set of Interrogatories to Plaintiff Nos. 14-20; Dennington Affidavit, **Tab

G**).[11]  That contention is insufficient as a matter of law.

        In sum, the "new" claim based on Bemis's 2005 repair work is functionally no different

than the old time-barred claims arising from Bemis's allegedly negligent installation and design

of the guy wire and guy insulator in 1998/99.  Bemis therefore is entitled to summary judgment

dismissing Counts IX-XII of Plaintiff's First Amended Complaint, and the Cross-Claims of SMI,

MTI, Bemis, LLC, and Hawkeye, LLC that are derivative of those claims.  See, e.g., James

Ferrera & Sons, Inc. v. Samuels, 21 Mass. App. Ct. 170, 174 (1985) (affirming that, where

---

[10]        Bemis's summary judgment motion properly is supported by an affidavit from Mr. Marchegiani, the only person with first-hand knowledge of this subject, that the 2005 repair work caused no change in the configuration of Substation 15 and its component parts.  (SOF ¶¶ 15-17).  Not only would a counter-assertion be utter speculation, see Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (reciting summary judgment standard); Fed. R. Civ. P. 56(e), the plaintiff's liability expert concedes the absence of any known evidence to suggest otherwise.  Tr. of Depo. of plaintiff's liability expert Duncan Glover, Ph.D., pp. 76:17-79:2, attached at **Tab J** to Dennington Affidavit.

[11]        It is telling that, in responding to seven interrogatories asking the plaintiff to state the basis for her different variations of her claim – failure to warn, failure to remedy, failure to inspect, failure to properly complete repairs, etc. – the plaintiff simply "cut and paste" a single answer in response to each question.  Each time, the answer states that Bemis should have installed more insulation on the guy wire.  (Plaintiff's Answers to Defendant Bemis Line Construction Company, Inc.'s First Set of Interrogatories to Plaintiff Nos. 14-20; Dennington Affidavit, **Tab G**).

plaintiff's claims against defendant were barred by G.L. c. 260, § 2B, so too were claims for indemnification and contribution filed by co-defendants).

C.    Plaintiff's Strict Liability Claim (Count XII) Independently Fails As A Matter Of Law.

Even if the statute of repose did not bar all the plaintiff's claims (it does), there are independent grounds for summary judgment dismissing Count XII (Strict Liability). Massachusetts does not recognize transmission of high voltage electricity as an abnormally dangerous activity for which a defendant may be held strictly liable for resulting harms.  See Clark-Aiken Co. v. Cromwell-Wright Co., Inc., 367 Mass. 70, 89 (1975) (reciting elements of strict liability).  Massachusetts has applied this form of tort to manmade flooding, explosive blasting, and escaped wild animals, see Varney v. R.J. Reynolds Tobacco Co., 118 F.Supp.2d 63, 70 (D. Mass. 2000) (refusing to apply strict liability in products liability action), but not to high voltage electricity.  Providers of high voltage electricity services are "not an insurer" and are not subject to strict liability for resulting harms.  Edgarton v. H.P. Welch Co., 321 Mass. 603, 610 (1947).  For public policy reasons, courts in other jurisdictions reach similar conclusions. Voekler, Delmarva Power & Light Co., 727 F. Supp. 991, 994 (D. Md. 1989); Smith v. Home Light & Power Co., 734 P.2d 1051, 1057 (Colo. 1987); Wirth v. Mayrath Indus., Inc., 278 N.W.2d 789, 792-93 (N.D. 1979).  Count XII therefore must be dismissed as a matter of law.

D.    Bemis, LLC and Hawkeye, LLC's Cross-Claims For Contractual Indemnification Do Not Exist Under The Clear Terms Of Section 8.1 Of The Asset Purchase Agreement.

Finally, this Court also must dismiss Count II of the Cross-Claim of Bemis, LLC and Hawkeye, LLC.  (Paper No. 52, p. 17).  Bemis, LLC and Hawkeye, LLC allege that Section 8.1 of the Asset Purchase Agreement (hereinafter "Agreement") executed between Bemis Line Construction Company, Inc. and Bemis, LLC obligates Bemis Line Construction Company, Inc. to indemnify them for attorneys' fees and damages incurred in this lawsuit.  (Id., p. 16).

## ARTICLE VII.  INDEMNIFICATION

8.1    Obligation of Seller and the Stockholder to Indemnify.  **Seller [i.e. Bemis Line Construction Company, Inc.]** and the Stockholder [i.e. Rodney H. Bemis] **shall** jointly and severally **indemnify**, defend, save and hold harmless all Indemnified Persons [i.e. Bemis, LLC and its "Affiliates"] **from and against any** and all claims, demands, damages (including, without limitation, incidental and consequential damages), Liabilities, losses, expenses (including, without limitation, reasonable attorney's fees and other costs and expenses incident to any suit, action or proceeding), assessments, judgments or deficiencies of any nature whatsoever (collectively, **"Losses"**) incurred or sustained by an Indemnified Person **which arises out of or results from** (a) the breach or inaccuracy of any representation or warranty of the Seller or the Stockholders set forth in this Agreement or any Related Agreement, (b) the breach of or failure to perform any term, provision, covenant or obligation of the Seller or the Stockholders set forth in this Agreement, (c) **any and all Liabilities and obligations of the Seller**, (d) any environmental claim or condition, (e) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with either Seller or the Stockholder (or any person acting on their behalf) in connection with any of the transactions contemplated by this Agreement, and (g) **the Liabilities**.[12]

(Agreement, Bemis Affidavit, **Tab A**, p. 10) (emphasis added).  Thus, to qualify as a "Loss" that triggers indemnification obligations, that "Loss" must "[arise] out of or [result] from" one or more of the categories listed in subparagraphs (a)-(g).

Here, subparagraphs (c) and (g) are the only two categories that possibly could describe the "Loss" at issue (i.e. this lawsuit).  Those subparagraphs refer to "Liabilities," a separately defined term:

> "Liabilities" means all debts, duties, liabilities, contracts, commitments, taxes and other obligations of every kind and character, whether accrued, absolute, contingent or otherwise whether due or to become due.

(Agreement, Section 1.1).  This definition captures liabilities of a contractual nature (e.g. debts, contracts, commitments, taxes and other obligations), but not tort claims of the type the plaintiff presses against Bemis, LLC and Hawkeye, LLC in this lawsuit.  The Agreement has a different defined term that refers to this type of lawsuit: the term "Proceeding" is defined in Section 1.1 as

---

[12]    There is no subpart (f) in this paragraph.

"any action, suit, claim, investigation, review or other action, at law or in equity, before any

Federal, state, municipal or other Governmental Authority."  But the term "Proceeding" appears

nowhere in Section 8.1.  It would have been facile for Bemis, LLC to have drafted the indemnity

obligation to include a "Loss" arising "from any Proceeding," "from any past work performed by

Bemis Line Construction," or the like.  It did not.  Accordingly, this lawsuit is not a "Loss"

triggering indemnification obligations for "Liabilities" under Section 8.1. [13]

CONCLUSION

WHEREFORE, this Court should **ALLOW** this Motion and enter summary judgment in

favor of Bemis Line Construction Company, Inc. n/k/a Bemis Enterprises, Inc. dismissing with

prejudice Counts IX-XII of Plaintiff's First Amended Complaint, and all Cross-Claims filed

against Bemis Line Construction Company, Inc. n/k/a Bemis Enterprises, Inc. by Specialty

Minerals, Inc., Minerals Technologies, Inc., Bemis, LLC, and Hawkeye, LLC.

BEMIS LINE CONSTRUCTION COMPANY,
INC. and BEMIS ENTERPRISES, INC.,

By their attorneys,

/s/ James B. Peloquin

_____
James B. Peloquin (BBO # 544168)
Andrew R. Dennington (BBO # 666892)
CONN KAVANAUGH ROSENTHAL
   PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA  02109
jpeloquin@ckrpf.com
adennington@ckrpf.com
Dated:  August 31, 2010                                (617) 482-8200

---

[13]         Any ambiguity left in the Agreement that Bemis, LLC drafted now must be resolved against it.  See Graff
v. Billet, 477 N.E.2d 212, 213 (N.Y. 1984). The Agreement is governed by New York law.  Agreement, Section 9.9.

479202.2

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the 31st day of August, 2010.

<u>/s/Andrew R. Dennington</u>